JOURNAL ENTRY AND OPINION
{¶ 1} Defendant-appellant Aaron Adams appeals from a judgment of conviction finding him guilty of one count of aggravated robbery, one count of robbery and one count of felonious assault. The charges stemmed from an incident in which appellant broke into a house, assaulted and robbed a man who had been playing cards with appellant's girlfriend. Appellant argues that (1) the court's judgment of conviction is against the manifest weight of the evidence and (2) counsel performed ineffectively by failing to object to the state's use of a 20-year-old *Page 2 
conviction to impeach a defense witness. Neither assignment of error has merit, so we affirm.
 1. I {¶ 2} Appellant first argues that the testimony of the state's primary witness was so inconsistent as to be unworthy of belief. He maintains that his witnesses gave a more consistent and realistic version of events.
 1. A {¶ 3} When reviewing a claim that a verdict is against the manifest weight of the evidence, we weigh all the reasonable inferences, consider the credibility of witnesses and, in considering conflicts in the evidence, determine whether the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. See State v. Thompkins (1997),78 Ohio St.3d 380, 387, 1997-Ohio-52. In doing so, we remain mindful that the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact. State v. DeHass (1967),10 Ohio St.2d 230, paragraph one of the syllabus. This gives the trier of fact the authority to "believe or disbelieve any witness or accept part of what a witness says and reject the rest." State v. Antill (1964),176 Ohio St. 61, 67.
 1. B *Page 3 {¶ 4} The state's primary witness,[1] Marlene Edwards, owned the house where the crimes occurred. She said that she, a girlfriend named Rhonda Ayers, and the victim, Eugene May, had been playing cards at her dining room table. Seven children under the age of 12 were also present. Sometime after 10:00 p.m., the three card players heard the sound of breaking glass. They turned around and saw appellant, an unidentified companion and a young child enter the house from the front door. Edwards said that appellant carried a gun, which she described as black and having a long barrel. Appellant approached May and pistol-whipped him. May fell to the ground, and appellant kicked May until he lost consciousness.
 {¶ 5} One of the children called the police. As appellant exited out the door, Edwards followed in order to close the door behind him. Appellant turned around and struck Edwards and one of the children in the face. By this time, May had regained consciousness. He went outside to find appellant, but appellant and his companion again beat him. Appellant took May's car keys, cell phone and wallet.
 {¶ 6} An ambulance arrived and transported May to the hospital. Police officers on the scene questioned those present, including Ayers. Ayers refused to speak to the police and likewise tried to discourage Edwards from doing so. May returned the following day to have his car towed because he no longer had his keys. Edwards said that after Ayers had been released from jail, Ayers called her, begging *Page 4 
her not to prosecute appellant because he was sorry for what he did. Edwards tape recorded the conversation and gave it to the police.
 {¶ 7} Edwards' daughter testified that appellant "broke in the home." She said that she and the other children were watching television and heard a noise. She saw appellant and another man enter the house and hit May. May apparently collapsed and appellant and his companion left the house. The daughter said that Edwards went to May's defense, but Ayers shut the door on her. The daughter went to the door and asked Ayers why she was locking her mother out of the house. The daughter said that she saw Edwards get hit and then appellant struck her. She then ran into the house and called the police.
 {¶ 8} A police officer who responded to the house testified that he saw broken glass by the front door and a splatter of blood on the sidewalk. A photograph admitted into evidence documented the broken glass. The officer said that as he and another officer interviewed Edwards, Ayers immediately began contradicting Edwards' version of events and claimed that appellant did not have a gun. Ayers told the police that appellant was her boyfriend and then became so irate at Edwards that the police placed Ayers in their zone car. As the police continued their interview with Edwards, Ayers yelled at Edwards from the zone car, calling her a liar and telling her to be quiet. The police received a description and license number of the *Page 5 
car that appellant drove. Two days later, they stopped a vehicle matching the description being driven by appellant.
 {¶ 9} Ayers testified on appellant's behalf and said that at the time she had been dating appellant for one year and that they had discussed marriage. She said that she had been planning to go to Edwards' house and that May drove by and offered her a ride. May decided to stay and he, Ayers and Edwards played cards and drank. Later that evening, appellant stopped by Edwards' house with his cousin to give Ayers a ride home. Ayers walked outside onto the porch, followed by May. May gave Ayers a hug by the front door. Appellant grabbed Ayers by the shoulder and said, "what are you doing?" May punched appellant in the mouth, and appellant fought back.
 {¶ 10} Appellant testified and corroborated Ayers' testimony. He said that he had been trying to call Ayers all day, but she did not answer (Ayers testified that her cell phone battery died). When he pulled up to Edwards' house, he could see into the house from the street. He saw Ayers sitting with May and instantly became jealous, thinking that she had avoided his calls because she was with another man. When Ayers exited the house and hugged May, appellant said that he grabbed her and asked her what she was doing. May asked appellant, "who the F is you?" Appellant asked May the same question, and then realized that May had been drinking. May punched appellant, and appellant fought back. Claiming that his *Page 6 
sobriety gave him the upper hand, appellant quickly subdued the intoxicated May. Appellant denied ever entering the house and further denied taking anything from May.
 1. C {¶ 11} Appellant's argument on the weight of the evidence is premised almost entirely on the inconsistency of testimony that Edwards gave at trial and in a preliminary hearing. At the preliminary hearing, Edwards testified that she believed that appellant and Ayers "set it up. They was trying to rob one of my friends. They did it together." Appellant argues that the plan to rob May was so ill-conceived as to be beyond any belief.
 {¶ 12} The court did not lose its way by finding appellant guilty. It found particularly credible the testimony and photograph showing broken glass, the tape recording of a 911 call, a photograph of a bruise on Edwards' cheek, and blood on the sidewalk. The court considered all of this proof that a major disturbance occurred. Those exhibits exist apart from any inconsistencies in testimony by the state's witnesses. We find the court acted rationally by finding this evidence credible because there is no other explanation as to how the glass by the door broke apart from testimony that appellant broke it to gain entry to the house.
 {¶ 13} The court expressly found Ayers' testimony to lack any credibility because it was inconsistent with other witnesses who had no motivation to lie. The *Page 7 
court found that it was significant that Ayers was uncooperative with the police and failed to explain to the police that the incident was all part of a misunderstanding. Additionally, the court did mention Ayers' motive to lie and she probably knew that appellant had been on parole for another offense and thus likely sought to prevent any police involvement for fear of jeopardizing appellant's parole.
 {¶ 14} The court did not mention Edwards' theory that appellant and Ayers had conspired to rob May. Although appellant argues that Edwards' conspiracy theory was so impractical as to be incredible, we find that Edwards' subjective belief as to why the offense occurred to be inconsequential in light of the totality of the evidence. Apart from her theory as to what motivated the offenses, Edwards, her daughter and the police officer testified consistent with the physical evidence. The court was in the best position to assess the credibility of the witnesses; we therefore conclude that the court did not lose its way by finding appellant guilty. The judgment of conviction is not against the manifest weight of the evidence.
 1. II {¶ 15} Appellant next argues that counsel performed ineffectively by failing to object when the state questioned Ayers about a theft offense that she committed 20 years earlier.[2] He maintains that this questioning violated Evid.R. 609(B), which *Page 8 
states the general rule that evidence of conviction that occurred more than 10 years ago is inadmissible.
 {¶ 16} To prevail on such a claim of ineffective assistance of counsel, the defendant must demonstrate both (1) deficient performance and (2) resulting prejudice; that is, errors on the part of counsel of a nature so serious that there exists a reasonable probability that, in the absence of those errors, the result of the trial court would have been different. State v. Bradley (1989), 42 Ohio St.3d 136. These two parts are conjunctive — the failure to establish either part will defeat a claim of ineffective assistance of counsel.
 {¶ 17} We need not consider whether the admission of Ayers' prior conviction violated Evid.R. 609(B) because we find no reasonable probability that the outcome of the trial would have been different had counsel objected. This case was tried to the court, so we presume that the court considered only relevant, material and competent evidence in arriving at its judgment. State v. Post (1987), 32 Ohio St.3d 380, 384. Although the court found that Ayers' testimony lacked credibility, it did so not in reference to her prior conviction, but because of her involvement with appellant. As appellant's girlfriend, Ayers had an obvious interest in seeing *Page 9 
appellant acquitted. Moreover, the testimony at trial showed that Ayers was not only uncooperative with the police, but that she tried to dissuade Edwards from prosecuting charges against appellant. Finally, Ayers' testimony was at odds with the physical evidence; for example, she said that she and May were on the porch before appellant arrived, yet the broken glass found on the scene suggested that appellant had entered the dwelling. These points so adversely affected Ayers' credibility that we find no reasonable probability that the court would have found appellant guilty on the mere mention of a defense witness' 20-year-old conviction.
 {¶ 18} The assigned errors are overruled.
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Cuyahoga County Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
MELODY J. STEWART, JUDGE
KENNETH A. ROCCO, P.J., and ANN DYKE, J., CONCUR
[1] The victim of the assault, Eugene May, did not testify at trial.
[2] The state asked Ayers if she had "ever been convicted of a crime of dishonesty or a felony punishable by one year within the last 10 years." Ayers answered "no," and again answered "no" when asked if she had ever been convicted of a theft offense. When the state again asked her if she had been convicted of a theft offense, she responded, "[y]ears ago, maybe for some baby socks. That was 20 years ago." The state then asked, "so you were convicted of theft 20 years ago?" Ayers responded, "[y]eah and I was not convicted." She again insisted that she had not been convicted, but then qualified her answer by "I thought you meant like getting put in jail. I mean I — I don't know. I wasn't sent to jail or nothing." *Page 1